UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------

UNITED STATES OF AMERICA,

- against -

**MEMORANDUM & ORDER**
16-CR-406 (MKB)

RICKY VARGAS,

               Defendant.

---------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

On July 6, 2017, Defendant Ricky Vargas pled guilty to one count of conspiracy to traffic heroin in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A)(i) and one count of conspiracy to commit kidnapping in violation of 18 U.S.C. § 1201(a)(1) and (c). (Indictment, Docket Entry No. 1; Min. Entry dated July 6, 2017, Docket Entry No. 82.) On February 14, 2019, the Court sentenced Vargas to 120 months of imprisonment to be followed by three years of supervised release. (J., Docket Entry No. 185.)

On March 16, 2021, Vargas, proceeding *pro se*, filed a motion for compassionate release requesting that the Court "immediately release him to home confinement for the remaining duration of his prison term (to be followed by three years of supervised release)," arguing that he "tested positive for COVID-19" in December of 2020 and "still suffers from fatigue, shortness of breath and lack of smell" and that Federal Corrections Institution, Schuylkill ("FCI Schuylkill"), where he is incarcerated, is "currently going through a second wave of the coronavirus" and is unable to provide him with appropriate medical care, placing him at "heightened risk of developing serious complications." (Def.'s Mot. for Compassionate Release ("Def.'s Mem.") 1, 3, 7, Docket Entry No. 241.) On March 24, 2021, the Court appointed counsel for Vargas and

directed the Government to respond to his motion. (Orders dated Mar. 24, 2021.) On May 17, 2021, appointed counsel filed a supplemental memorandum of law in support of Vargas's motion. (Def.'s Suppl. Mem. in Supp. of Compassionate Release ("Def.'s Suppl. Mem."), Docket Entry No. 253.) On June 16, 2021, the Government opposed Vargas's motion, arguing that he has not shown extraordinary and compelling reasons warranting release and that, in any event, the 18 U.S.C. § 3553(a) factors warrant his continued detention. (Gov't Resp. in Opp'n to Def.'s Mot. ("Gov't Opp'n") 1, Docket Entry No. 258; *see also* Def.'s Reply to Gov't Opp'n ("Def.'s Reply"), Docket Entry No. 260.)

For the reasons discussed below, the Court denies Vargas's motion.

## I. Background

### a. Guilty plea and sentencing

In June of 2014, Vargas and others were members of a Queens, New York-based heroin trafficking crew that imported heroin from Ecuador and distributed it throughout the New York City area. (Presentence Investigation Report ("PSR") ¶ 5, Docket Entry No. 122.) The drug connection in Ecuador would mail packages of heroin every few weeks to parcel stores in Brooklyn and Queens, where members of the crew, including Vargas and John Doe #1, would pick up the drugs and distribute them to various dealers. (*Id.*)

On February 6, 2015, John Doe #1 was arrested after picking up a heroin parcel at a parcel store in Queens. (*Id.* ¶ 6.) Shortly after he was released from custody, he told the leader of the crew, Vargas's cousin and codefendant Gonzalo Erick Aguilar Vargas ("Aguilar"), that he had thrown the heroin parcel on the ground when the police were chasing him, and Aguilar demanded that they meet to discuss the lost parcel. (*Id.* ¶¶ 5, 10–11.) When John Doe #1 and his girlfriend Jane Doe #1 went to the designated location to meet Aguilar, Vargas approached

them and opened the door of an SUV in which other members of the crew were waiting, and John Doe #1 and Jane Doe #1 entered the SUV.  (*Id.* ¶¶ 12, 14, 49.)  John Doe #1 and his girlfriend were then driven to 34th Street and Queens Boulevard, and Vargas told John Doe #1 that Aguilar was on his way to confront John Doe #1 about the lost drug parcel.  (*Id.* ¶ 13.)  At 9:30 PM, a Ford Fusion pulled in front of the parked SUV and Vargas's codefendant Kiancin Lee and another individual ("CC-5") got out of the car and approached John Doe #1, who was standing outside of the SUV.  (*Id.* ¶ 14.)  As Lee and CC-5 approached, John Doe #1 attempted to flee the scene and Vargas prevented him from running by grabbing his arm.  (Sentencing Tr. 6, 16; PSR ¶ 50.)  Lee, Vargas, and CC-5 then threw John Doe #1 to the ground and began beating him.  (PSR ¶ 14.)  At some point, John Doe #1 escaped and ran toward Queens Boulevard, and either Vargas or CC-5 yelled "shoot him."  (*Id.*)  When the group was unable to locate him, Lee or CC-5 forced Jane Doe #1 into the back seat of a car, made her put a jacket over her face so that she could not see them, and dropped her off in Queens, photographing her license and stating that if anything happened to them, they knew where she lived and would come look for her.  (*Id.* ¶¶ 15–16.)

On July 6, 2017, Vargas pled guilty to one count of conspiracy to traffic heroin and one count of conspiracy to commit kidnapping.  (Min. Entry dated July 6, 2017.)  At sentencing on February 14, 2019, the Court noted that Vargas's lack of criminal history "speaks loudly," that he was "not someone who [was] . . . in society committing crimes," and that he "got caught up in something that [he] otherwise would not have" been involved with.  (Sentencing Tr. 19, 25.)  The Court also highlighted that Vargas had "always worked," had "always supported [his] family," and that his family was "used to depending" on him.  (*Id.* at 20.)  In addition, the Court believed that Vargas was "very remorseful."  (*Id.* at 18, 25.)  The Court sentenced Vargas to 120

months of imprisonment to be followed by three years of supervised release.[1] (*Id.* at 18–19, 21.) Vargas is currently serving his term of incarceration at FCI Schuylkill, has served approximately sixty-five months of his 120-month sentence, and has a tentative release date of May 30, 2025.[2] (Order of Detention, Docket Entry No. 6; Gov't Opp'n 1.)

### b. Compassionate release application

Vargas, who is now twenty-nine years old, (*see* PSR 2), argues that extraordinary and compelling reasons for a reduction exist because of "his risk of reinfection," the "impact of COVID-19 on the conditions of [his] confinement, his mental and physical health, and his lack of proper medical attention,"[3] the excessive length of his sentence in proportion to his role in the crime and his lack of criminal history, and his rehabilitation. (Def.'s Suppl. Mem. 7. *See generally id.* at 7–16.) In addition, he argues that the relevant 18 U.S.C. § 3553(a) factors support his release, given his lack of criminal history; "extensive" inmate education transcript, including obtaining his General Education Diploma; and his employment as an orderly and kitchen aide at FCI Schuylkill. (*Id.* at 16–19.) Vargas also argues that he is not a danger or risk

---

[1] The Court noted that "if [it] could, [it] would have given [Vargas] a sentence less than" the sentence imposed; however, because conspiracy to traffic heroin in violation of 21 U.S.C. § 841(b)(1)(A)(i) carries a ten-year mandatory minimum sentence, the Court's "hands [were] tied." (Sentencing Tr. 20; J.); *see United States v. Carter*, 696 F.3d 229, 233 (2d Cir. 2012) (holding that "a statutory mandatory minimum provision constrains a district court's discretion under 18 U.S.C. § 3553(a) when it 'specifically provide[s]' a minimum sentence" (alteration in original)).

[2] Vargas states that his release date is May 5, 2025. (Def.'s Mem. 1.) However, the Bureau of Prisons' inmate lookup reflects a release date of May 30, 2025. *Bureau of Prisons*, BOP.gov, https://www.bop.gov/mobile/find_inmate/byname.jsp#inmate_results (last visited Jan. 6, 2021); (*see also* Gov't Opp'n 1).

[3] Vargas notes that he "sought but has been unable to obtain" his medical records and "will review and supplement or amend this submission as necessary after obtaining these records." (Def.'s Suppl. Mem. 1 n.1.) The Government appended Vargas's medical records to its opposition, filed on June 16, 2021. (Medical Records, annexed to Gov't Opp'n as Ex. A, Docket Entry No. 258-1.) To date, Vargas has not moved to supplement or amend his motion.

to the public and that he "has a concrete plan to reintegrate into society," including reobtaining his state and city certification in asbestos removal to support himself and his family, including his young son, and living in New Jersey with his parents, with whom he "remains close." (*Id.* at 19.)

The Government urges the Court to adopt section 1B1.13 of the U.S. Sentencing Guidelines as the definition for "extraordinary and compelling reasons" and argues that Vargas "cannot prove any of the extraordinary and compelling reasons articulated in section 1B1.13." (*See* Gov't Opp'n 2–3.) In addition, the Government argues that Vargas's proffered reasons for release are not extraordinary and compelling. (*Id.* at 3–4.) With respect to FCI Schuylkill's handling of the pandemic, the Government argues that it "is not aware of evidence that [Vargas] is currently facing any high-risk health conditions," and "COVID-19 is well-controlled at FCI Schuylkill." (*Id.* at 3.) With respect to Vargas's argument that the excessive length of his sentence contributes to an extraordinary and compelling basis for relief, the Government argues that this Court "did not, and does not" have discretion to sentence Vargas below the mandatory minimum sentence provided for by statute, and "there is no authority permitting this Court to now deem that mandatory minimum sentence 'excessive,'" which Vargas "acknowledges . . . in his motion, noting that the cases on which he relies critically differ from the instant one in that they involved mandatory minimum sentences that Congress had changed." (*Id.* at 4.) Finally, the Government argues that "[e]ven if extraordinary and compelling reasons were to exist here," the 18 U.S.C. § 3553 factors do not support release because Vargas was "an active participant in the charged heroin trafficking conspiracy," picking up and distributing heroin and drug proceeds, and "played a critical role in the kidnapping of John Doe #1 and Jane Doe #1" by initially

5

kidnapping them, remaining in "close contact with the most culpable members of the kidnapping conspiracy," and beating John Doe #1.  (*Id.* at 4–5.)

## II. Discussion

"A court may not modify a term of imprisonment once it has been imposed except pursuant to statute."  *United States v. Gotti*, 433 F. Supp. 3d 613, 614 (S.D.N.Y. 2020).  Under 18 U.S.C. § 3582(c), and as relevant here, courts may modify a previously imposed sentence where:

> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of [thirty] days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment . . . after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that —
>
> > (i) extraordinary and compelling reasons warrant such a reduction; or
> >
> > (ii) the defendant is at least [seventy] years of age, has served at least [thirty] years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A)(i)–(ii).

Pursuant to section 3582(c)(1)(A)(i), a district court may "reduce a term of imprisonment or release a defendant" if it "find[s] that . . . extraordinary and compelling reasons warrant such a

6

reduction." *United States v. Jones*, 17 F.4th 371, 374 (2d Cir. 2021) (per curiam) (quoting 18 U.S.C. § 3582(c)(1)(A)(i)); *see also United States v. Cummings*, No. 20-3156, 2021 WL 4142844, at *1 (2d Cir. Sept. 13, 2021) (same); *United States v. DiBiase*, 857 F. App'x 688, 688–89 (2d Cir. 2021) (same); *United States v. Fernandez*, 853 F. App'x 730, 731–32 (2d Cir. 2021) (same); *United States v. Roney*, 833 F. App'x 850, 852 (2d Cir. 2020) (same).  However, "district courts are not confined to those reasons set forth by the BOP Director in evaluating compassionate release motions brought by defendants and instead are free 'to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them.'" *Jones*, 17 F.4th at 374 n.3 (quoting *United States v. Brooker*, 976 F.3d 228, 235–37 (2d Cir. 2020)); *United States v. Souza*, No. 20-3829, 2021 WL 3871262, at *1 (2d Cir. Aug. 31, 2021) ("[T]he Sentencing Commission's policy statements do not 'constrain district courts' discretion to consider whether any reasons are extraordinary and compelling.'" (quoting *Brooker*, 976 F.3d at 236)).

"Even if 'extraordinary and compelling' circumstances exist, however, the court must also consider 'the factors set forth in section 3553(a) to the extent that they are applicable' before it can reduce the defendant's sentence." *Jones*, 17 F.4th at 374 (quoting 18 U.S.C. § 3582(c)(1)(A)) (noting that "extraordinary and compelling reasons are necessary — but not sufficient — for a defendant to obtain relief" and that "a district court's 'reasonable evaluation of the [s]ection 3553(a) factors' is 'an alternative and independent basis for denial of compassionate release'"); *see also Souza*, 2021 WL 3871262, at *2 (affirming district court's ruling that "even if [a defendant]'s medical conditions demonstrated extraordinary and compelling reasons for release, 'the factors set forth in [section 3553] militate toward continued confinement'" (quoting *United States v. Bolino*, No. 06-CR-806, 2020 WL 4749807, at *2 (E.D.N.Y. Aug. 17, 2020)));

7

*United States v. Butler*, 845 F. App'x 74, 77 (2d Cir. 2021) ("[T]he district court acted well within its discretion in concluding that, even if extraordinary and compelling circumstances existed for his release, [the petitioner's] compassionate release motion should be denied because his release was not consistent with the [s]ection 3553(a) factors in this case."); *Roney*, 833 F. App'x at 853 ("We need not decide whether [the appellant] has proffered an extraordinary and compelling reason that warrants his release . . . because, even assuming *arguendo* that he has, we discern no abuse of discretion in the district court's conclusion that release is nevertheless unwarranted upon consideration of the [section] 3553(a) factors.").

Although the Court takes seriously the threat posed by the pandemic to incarcerated individuals and sympathizes with Vargas, who has already contracted COVID-19 once while in custody, the Court finds that he has not shown extraordinary and compelling reasons for his release.[4]  Vargas's motion is "[p]rimarily . . . based on the . . . impact of COVID-19 on the conditions of [his] confinement, his mental and physical health, and his lack of proper medical attention" at FCI Schuylkill.  (Def.'s Suppl. Mem. 7.)  As Vargas argues, numerous courts, including this one, have acknowledged that COVID-19 poses a unique threat to federal inmates

---

[4] As Vargas argues and the Government appears to acknowledge, the Court has discretion to determine what circumstances are extraordinary and compelling, and although section 1B1.13, which the Government urges the Court to adopt, "provides some useful guidance," *United States v. Markou*, No. 08-CR-399, 2020 WL 6945923, at *2 (E.D.N.Y. Nov. 25, 2020), it is not binding, *Brooker*, 976 F.3d at 237 (holding that section 1B1.13 does not apply when the defendant is the movant, and that district courts therefore have the authority to consider the "full slate" of extraordinary and compelling reasons for a sentence reduction presented by a defendant's motion); (Def.'s Reply 1; Gov't Opp'n 2 & n.1 (disagreeing with *Brooker*'s holding but acknowledging that this Court "must follow" it).  Therefore, the Court considers the "full slate" of extraordinary and compelling reasons presented by Vargas in his motion.

and has increased the harshness of the conditions of confinement.[5] (*See, e.g.*, *id.* at 7, 9–10 (collecting cases).) However, none of the courts in the cases Vargas cites have found that merely "the impact of COVID-19 can constitute extraordinary and compelling circumstances," as Vargas suggests. (*Id.* at 8.) Rather, each of these cases involved defendants who, unlike Vargas, suffered from serious underlying medical conditions that placed them at particular risk of severe illness or death should they contract COVID-19, and the courts in these cases found that this increased risk constituted an extraordinary and compelling reason for release. *See United States v. Williams*, No. 10-CR-657, 2021 WL 1648182, at *1–2 (E.D.N.Y. Apr. 27, 2021) (defendant suffering from obesity, asthma, and Type-2 diabetes mellitus); *United States v. Barriga-Beltran*, No. 19-CR-116, 2021 WL 1299437, at *1–2 (E.D.N.Y. Apr. 7, 2021) (sixty-one-year-old defendant suffering from hypertension, type II diabetes, coronary artery disease, and asthma); *United States v. Jean*, No. 17-CR-372, 2021 WL 1264239, at *3 (E.D.N.Y. Apr. 6, 2021) (thirty-eight-year-old defendant suffering from "uncertain medical skin condition" that "may relate to an immunity deficiency"); *see also United States v. Mongelli*, No. 02-CR-307, 2020 WL 6449237, at *1, *3 (E.D.N.Y. Nov. 3, 2020) (finding extraordinary and compelling reasons where the defendant suffered from prostate cancer and had a "weakened immune system" due to radiation treatment and the "circumstances of his confinement 'substantially diminish[ed]' his 'ability . . . to provide self-care'" due to his "serious underlying health condition, his recent COVID-19 infection, and the failure of the Bureau of Prisons to prevent and control a COVID-19 outbreak" at his facility); *United States v. Pellot*, No. 19-CR-169, 2021 WL 807242, at *2 (S.D.N.Y. Mar. 3, 2021) (finding extraordinary and compelling reasons based on age and underlying medical

---

[5] Vargas notes that, due to the impact of COVID-19, "he spent approximately five months in solitary confinement" while awaiting transfer to FCI Schuylkill. (Def.'s Suppl. Mem. 10.)

conditions where the defendant was fifty-four years old and suffered from "obesity, degenerative joint disease, and a heart condition," as well as "high blood pressure, high cholesterol, [and] asthma"). In addition, as the Government argues, COVID-19 appears to be under control at FCI Schuylkill, where there are currently twenty-three active inmate cases and three active staff cases. *See COVID-19 Coronavirus*, Fed. Bureau of Prisons, https://www.bop.gov/coronavirus (last visited Jan. 11, 2021); *see also Roney*, 833 F. App'x at 855 (noting that "courts entertaining compassionate-release motions brought by high-risk inmates during this unprecedented time have considered the number of confirmed COVID-19 cases at a facility in assessing the adequacy of the facility's protective measures and accordingly determining whether a defendant has demonstrated a particularized risk of contracting COVID-19").

Vargas also argues that his "previous experiences and his COVID-19 diagnosis support this Court finding extraordinary and compelling circumstances," noting that he was symptomatic when he was diagnosed,[6] that "[s]ome of [his] symptoms continue today," and that, during his thirty-one days in isolation as a result of his diagnosis, he "asked numerous times for medical attention" but "was not evaluated" and received only "low-dose painkillers." (Def.'s Suppl. Mem. 9; *see also* Def.'s Mem. 9.) In support, Vargas cites two cases for the proposition that the Bureau of Prisons "has proven itself unequipped to provide adequate medical care and supervision in response to COVID-19." (Def.'s Suppl. Mem. 9.) However, the Court finds these cases unpersuasive. In *United States v. Diaz*, a thirty-five-year-old defendant with a history of

---

[6] Vargas's medical records indicate that he was asymptomatic when he tested positive for COVID-19 in December of 2020. (*See* Medical Records 16, 24; Def.'s Mem. 9.) Vargas disputes that he was asymptomatic and asserts that he "unequivocally made the medical staff aware that he was experiencing headaches, nausea, chest pains, muscle aches, coughing, [and] had] a fever," and that he was experiencing "lack of smell and taste," but the medical staff "refused to record" his symptoms. (Def.'s Mem. 4; Def.'s Suppl. Mem. 9.) The Court credits Vargas's assertions.

10

mild asthma tested positive for COVID-19 five days after passing out and falling in a bathroom stall.  *See* No. 13-CR-437, 2021 WL 1108910, at *1 (E.D.N.Y. Mar. 23, 2021).  Like Vargas, he was placed in lockdown, "where he found it difficult to secure treatment for his lingering symptoms."  *Id.*  Unlike Vargas, however, the defendant sought compassionate release based on symptoms that were not clearly related to COVID-19, arguing that he was experiencing "severe headaches in the lower back of his head, tingling and numbness in his hands, and frequent episodes of vertigo, lightheadedness, and nausea."  *Id.*  The defendant was "unsure whether his persistent symptoms [we]re the long-term effects of COVID-19 or relate[d] to his fall."  *Id.*  Concerned by this, the court found extraordinary and compelling reasons for a sentence reduction based on the defendant's "troubling and uncertain medical condition for which the BOP, understandably in light of its focus on combatting the COVID-19 pandemic, has been unable to provide an adequate course of treatment."  *Id.* at *3.  The second case Vargas cites, *United States v. Vega*, is also inapposite, as the court based its finding of extraordinary and compelling reasons on the defendant's "age and underlying conditions," which, as in the cases discussed above, placed him "at risk of severe complications from COVID-19."[7]  *See* No. 89-

---

[7] In both cases, the courts noted that because the defendants had contracted COVID-19, "the [c]ourt 'focuses on the impact of COVID-19 on [the defendant] and his ability to "provide self-care" within the correctional facility in light of his diagnosis.'"  *United States v. Diaz*, No. 13-CR-437, 2021 WL 1108910, at *3 (E.D.N.Y. Mar. 23, 2021) (quoting *United States v. Vega*, No. 89-CR-229, 2020 WL 7060153, at *3 (E.D.N.Y. Dec. 2, 2020)); *Vega*, 2020 WL 7060153, at *3 (quoting *United States v. Adams*, No. 10-CR-82, 2020 WL 4505621, at *3 (S.D.N.Y. Aug. 4, 2020)).  Vargas argues that the Court should not limit itself to focusing on his ability to provide self-care within FCI Schuylkill in view of the broad discretion *Brooker* gives courts in terms of what they may consider and the developing scientific research on COVID-19.  (Def.'s Suppl. Mem. 8–9 (quoting *Vega*, 2020 WL 7060153, at *3).)  While the Court does not limit itself to focusing on Vargas's ability to provide self-care following his December 2020 diagnosis, the Court notes that Vargas appears better able to care for himself than the defendants in *Diaz* and *Vega*, who suffered from an uncertain medical condition and underlying medical conditions, respectively, as further discussed above.  *See Diaz*, 2021 WL 1108910, at *1 ("'[T]here is no guarantee that [the defendant's] symptoms and medical needs will remain so minimal,'

CR-229, 2020 WL 7060153, at *2–3 (E.D.N.Y. Dec. 2, 2020) (sixty-five-year-old defendant "designated as a 'Chronic Care' inmate and suffer[ing] from hearing loss and various ailments, including hypertension, hyperlipidemia, mitral valve prolapse, and anemia"). Although the Court credits Vargas's assertions that he was symptomatic when initially diagnosed with COVID-19 and found it difficult to secure treatment for his symptoms, Vargas has since tested negative for COVID-19, and there is no evidence that he is receiving inadequate care for lingering symptoms of any kind at this time or that his ability to care for himself has been substantially diminished. In addition, as discussed above, there is no evidence that he is at particular risk of becoming seriously ill from COVID-19 or that the current risk of contracting COVID-19 at FCI Schulykill is particularly high.

      Finally, Vargas argues that the excessiveness of his sentence relative to his crime contributes to an extraordinary and compelling basis for relief, and that "[n]umerous district courts across the country . . . have granted sentence reductions for defendants based at least in part on the length of the defendant's sentence." (Def.'s Suppl. Mem. 10–11.) In support, Vargas cites to a line of cases involving compassionate release motions based on a provision of the First Step Act that eliminated the harsh mandatory "stacking" of mandatory minimum sentences imposed under 18 U.S.C. § 924(c). (*See id.* at 11–14 & 11 n.4.) Although Vargas acknowledges that these cases are distinct from his case because they involved defendants who were initially sentenced pursuant to mandatory minimums that Congress later changed, he argues that "his

---

*especially given the concerning medical episodes [the defendant] has experienced coupled with, and potentially connected to, his COVID-19 diagnosis . . . ."* (emphasis added) (quoting *United States v. Mongelli*, No. 02-CR-307, 2020 WL 6449237, at *3 (E.D.N.Y. Nov. 3, 2020))); *Vega*, 2020 WL 7060153, at *3 ("[T]here is no guarantee that [the defendant's] symptoms and medical needs will remain so minimal, *especially given his underlying condition[s]* . . . ." (emphasis added) (third alteration in original) (quoting *Mongelli*, 2020 WL 6449237, at *3)).

12

circumstances are analogous to those [of defendants] subjected to stacked § 924(c) counts because he was likewise subjected to a mandatory minimum employed in a way that Congress did not intend." (Def.'s Reply 2; *see also* Def.'s Suppl. Mem. 14.) Specifically, he argues that when Congress created the mandatory minimum sentence pursuant to which he was sentenced, it "intended to punish defendants involved in drug-trafficking offenses by role" but "made a mistake" and "hinged the ten-to-life sentence enhancement . . . on drug quantity instead," which is a "poor proxy for culpability," and therefore he was charged with the ten-to-life mandatory minimum provision intended for leaders and organizers despite being "the least culpable of all three male defendants," resulting in an excessive sentence. (Def.'s Suppl. Mem. 14–15 (quoting *United States v. Dossie*, 851 F. Supp. 2d 478, 480 (E.D.N.Y. 2012))); *Dossie*, 851 F. Supp. 2d at 479–80 (explaining that Congress intended the ten-year mandatory minimum sentence to be for organizers and leaders but "made a mistake" and hinged the ten-to-life sentence enhancement on drug type and quantity instead of "on the government's proof of 'kingpin' or leadership status").

      Although the Court appreciates Vargas's argument, the Court finds it unpersuasive. The Court agrees with Vargas that while the cases he cites are distinct, they support the proposition that courts may grant sentence reductions "based at least in part on the length of the defendant's sentence." (Def.'s Suppl. Mem. 10–11; *see id.* at 11 n.4, 12); *see, e.g.*, *United States v. McCoy*, 981 F.3d 271, 286 (4th Cir. 2020) (finding that "the district courts permissibly treated as 'extraordinary and compelling reasons' for compassionate release the severity of the defendants' § 924(c) sentences and the extent of the disparity between the defendants' sentences and those provided for under the First Step Act"); *United States v. Maumau*, 993 F.3d 821, 837 (10th Cir. 2021) (affirming grant of compassionate release based on district court's "individualized review of all the circumstances" of the defendant's case, including "the 'incredible' length of his stacked

13

mandatory sentences under § 924(c); the First Step Act's elimination of sentence-stacking under § 924(c); and the fact that [the defendant], 'if sentenced today, . . . would not be subject to such a long term of imprisonment'"). Indeed, as Vargas points out, this Court has also granted a sentence reduction based in part on the excessive length of a defendant's sentence. (*See* Def.'s Suppl. Mem. 13–14 (citing *United States v. Kissi*, 469 F. Supp. 3d 21 (E.D.N.Y. 2020))); *Kissi*, 469 F. Supp. 3d at 39–40 (granting compassionate release motion after considering the excessiveness of the mandatory minimum sentence imposed, the impact of COVID-19, and the lower guidelines range the defendant might have received following the First Step Act's changes to 18 U.S.C. § 3553(f)). In addition, the Court acknowledges that "a statutory change to the sentence" does not itself appear to be "a prerequisite for relief." (Def.'s Suppl. Mem. 14 (citing *United States v. Millan*, No. 91-CR-685, 2020 WL 1674058, at *3, *15 (S.D.N.Y. Apr. 6, 2020))); *see Millan*, 2020 WL 1674058, at *3, *15 (reducing the defendant's mandatory life sentence to time served despite the fact that the mandatory minimum had not changed).

However, Vargas's reliance on cases in which Congress subsequently changed the law does not provide a basis for the Court to resentence him because of what Congress may have "initially intended." (Def.'s Suppl. Mem. 14.) As at least one court has explained, even where the "ten-year mandatory minimum sentence [may appear] longer than necessary under the [U.S. Sentencing Guidelines] and 18 U.S.C. § 3553(a) factors":

> the compassionate release procedure is not a tool to simply correct a sentence because the original sentence appears too long . . . . Here, with a mandatory minimum sentence of ten years, to simply resentence the [d]efendant because the undersigned believes that mandatory minimum sentences are bad law, generally, or as applied, would be inappropriate. To do so would be tantamount to reversing the United States Congress in its law-making authority (and tantamount to reversing the charging authority of the United States Attorney and Grand Jury). This [c]ourt lacks authority — or the discretion — to resentence [the defendant]. His ten-year mandatory

14

>  minimum sentence is not an extraordinary or compelling reason under the law.

*United States v. Manglona*, No. 14-CR-5393, 2021 WL 211537, at *3 (W.D. Wash. Jan. 21, 2021), *reconsideration and motion granted on other grounds*, 2021 WL 808386 (W.D. Wash. Mar. 3, 2021). Regardless of what the legislative intent behind the mandatory minimum sentence pursuant to which Vargas was sentenced may have been, the statute as enacted tied the ten-year mandatory minimum sentence to drug quantity. Therefore, while the Court agrees that the mandatory minimum sentence is excessive in this case — the Court said so at sentencing — and appreciates Vargas's argument that his sentence is "unusually long . . . because of what Congress initially intended," the cases on which he relies do not provide a basis for the Court to find extraordinary and compelling reasons for his release. (Def.'s Suppl. Mem. 14); *see* S. Rep. No. 98-225, at 55–56 (1983) (stating that "there may be unusual cases in which an eventual reduction in the length of a term of imprisonment is justified by *changed circumstances*," including "cases of severe illness, cases in which *other extraordinary and compelling circumstances justify a reduction of an unusually long sentence*, and some cases in which the sentencing guidelines for the offense of which the defend[ant] was convicted have been later amended to provide a shorter term of imprisonment" (emphases added)).

Because Vargas does not appear to be at increased risk of severe illness or death should he contract COVID-19; COVID-19 appears to be under control at FCI Schuylkill; and there is no evidence that Vargas is receiving inadequate care for lingering symptoms at this time or that his ability to care for himself has been substantially diminished, the Court finds that his proffered reasons for release do not rise to the level of extraordinary and compelling circumstances at this time.

### III. Conclusion

Accordingly, for the reasons explained above, the Court denies Vargas's motion for compassionate release without prejudice to renewal, should circumstances change at his facility or otherwise.

Dated: January 11, 2022
        Brooklyn, New York

SO ORDERED:

s/ MKB

_____
MARGO K. BRODIE
United States District Judge